UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES T.,<br><br>                            Plaintiff,<br>v.<br>ANDREW SAUL,<br>Commissioner of Social Security,<br>                            Defendant. | No. 3:20-cv-00985-JM-LL<br><br>**REPORT AND RECOMMENDATION REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>**[ECF Nos. 17, 20]** |

Plaintiff James T. brought this action for judicial review of the Social Security Commissioner's denial of his claim for disability insurance benefits. Before this Court are Plaintiff's Motion for Summary Judgment [ECF No. 17 ("Pl.'s Mot.")], Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment [ECF No. 20 ("Def.'s Mot.")], and Plaintiff's Reply in Support of Motion for Summary Judgment [ECF No. 21 ("Pl.'s Reply")].

This Report and Recommendation is submitted to United States District Judge Jeffrey T. Miller pursuant to 28 U.S.C. § 636(b) and Civil Local Rule 72.1(c) of the United States District Court for the Southern District of California. For the reasons set forth below, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be

**GRANTED**, and Defendant's Cross-Motion for Summary Judgment be **DENIED**. This Court further **RECOMMENDS** that the case be **REMANDED** for further proceedings.

## I.   PROCEDURAL BACKGROUND

On July 8, 2016, Plaintiff applied for Title II disability insurance benefits ("DIB") pursuant to Title II. See Administrative Record ("AR") at ECF No. 15 at 222-227. On June 8, 2016, Plaintiff filed an application for Supplemental Security Income ("SSI") pursuant to Title XVI. Id. at 228-235. In both applications, Plaintiff alleged disability beginning on October 1, 2015. Id. at 222-235.  Plaintiff's claims for both DIB and SSI were initially denied on November 8, 2016. Id. at 155-160. Plaintiff requested reconsideration of the initial determination on January 6, 2017, which was denied on May 25, 2017.  Id. at 165-171.  On June 8, 2017, Plaintiff requested a hearing before an Administrative Law Judge. Id. at 172-173.

On February 13, 2019, a hearing was held before Administrative Law Judge ("ALJ") Jay E. Levine.  Id. at 47-65.  On March 13, 2019, ALJ Levine denied Plaintiff's claim. Id. 20-46. On March 27, 2020, the Appeals Council denied Plaintiff's request for review. Id. 1-6. The ALJ's decision became the final decision of the Commissioner on March 27, 2020, when the Appeals Council denied Plaintiff's request.  Id.

On March 26, 2021, Plaintiff filed a Motion for Summary Judgment. ECF No. 17. On April 29, 2021, Defendant filed a Cross-Motion for Summary Judgment. ECF No. 20. On May 13, 2021, Plaintiff filed a Reply. ECF No. 21. Defendant did not file a Reply in Support of the Motion for Summary Judgment. See Docket.

## II.   DISABILITY HEARING

On February 13, 2019, Plaintiff appeared with counsel at the hearing before the ALJ. Id at 47-52. During the hearing, Plaintiff's counsel commented that Plaintiff forgot his hearing aids and was unable to retrieve them for purposes of the hearing.[1] Id. at 49. Plaintiff

---

[1] When asked if he could hear counsel speak at the hearing, Plaintiff indicated he could only hear "a little bit." AR 50. Plaintiff repositioned himself to sit in a different chair to

stated he was born with hearing trouble, and although one ear was initially worse, both ears were now equally bad. Id. at 60.

The ALJ questioned Plaintiff regarding his work experience and alleged disability. Id. at 49-65. Plaintiff testified that he was forty-five years old and had a high school diploma. Id. at 51. Plaintiff stated that he was placed in special education while in high school. Id. Plaintiff described his trouble in school included difficulty with comprehension and being listed as "slow." Id. Plaintiff stated that he did not take college classes after high school. Id. Plaintiff stated he had one thirteen-year-old daughter who attends school and stays in a women's transitional home with the owner of the property. Id. at 51, 54. Plaintiff stated that he had no other sources of income apart from general relief and food stamps. Id. at 51.

Plaintiff described his work history, testifying that he worked from 2007 to 2010. Id at 52. In 2007, Plaintiff worked with an elder member of his church who "t[ook] [him] under his wing" to do assembly work. Id. From 2008 to 2010, Plaintiff worked for Richmond Management Corporation as a security guard. Id. In 2008, Plaintiff earned over $14,000. Id. In 2009, Plaintiff earned $17,000, and in 2010, Plaintiff earned $6,500. Id. His job duties at the Richmond Management Corporation involved sitting down at a gate and signing trucks into a cruise ship terminal. Id. When asked about his employment gap between 2009 and 2014, Plaintiff responded that "[t]here was a[n] [inaudible] issue." Id. at 52-53.  In 2015, Plaintiff worked for South Bay Sand Blasting as a janitor. Id. at 53. Plaintiff explained that the job did not require lifting of heavy equipment. Id. When questioned about this job, Plaintiff responded that he "couldn't function" and "wasn't moving fast enough" so they "let him go." Id. Plaintiff stated he has not tried to work since due to mental issues.  Id.

---

hear better. Counsel asked Plaintiff again if he could hear, and stated for the record that Plaintiff was trying to read his lips. Plaintiff's counsel then used a microphone to assist Plaintiff's hearing. Id. at 57.

Plaintiff was asked if he could do similar work to his job as a security guard today. Id. at 58. Plaintiff responded no:

> I'm not good with people. I'm not. I can't. I'm not a patient person with my mental and my – the things that I am going through. I don't want to wind up going to jail with the stuff that I am going through.

Id. Plaintiff was asked whether "[he] can get angry pretty easily," to which Plaintiff responded "yes." Id.

Plaintiff's counsel later asked him regarding his work as a janitor at the shipyard, asking if Plaintiff could do that same job today. Id. at 59. Plaintiff responded he could not:

> I'm not in the mood to do that. The way my body is I am not. My pain, going up and down the stairs and trying to keep up with people, I won't be able to function real right.

Id. at 59-60.

Plaintiff stated he has "a lot" of problems, both physical and mental. Id. at 54. Physically, Plaintiff stated he cannot do "much of anything." Id. at 54-55. Plaintiff testified he had surgery on both sides of both wrists because his hands "start to lock up" painfully when attempting to lift objects:

> I can't do much of anything. Like, you know, as far as like bending over, I can't even tie my own shoes. I came in, you know. I didn't do most of the things like everybody else do. I could only walk a minimum, a minimum of time, and then after that I have to sit down. You know. At the time, I have to get my daughter to tie my shoes or put my socks on. I can't. I can't even do much of anything right now, as far as lifting or trying to do most things I used to do when I was young.

Id. at 54.

While residing at the transitional home, Plaintiff stated he did some housework in exchange for reduced rent. Plaintiff stated he only worked a few hours a week, and "didn't do much of anything . . . [I] physically can't do much." Id. at 59. His duties included cleaning the bathroom, and for a brief period, cooking meals for residents, until he was replaced. Id. at 58.

His counsel noted Plaintiff arrived at the hearing with a cane. Id. Plaintiff stated he has "real bad knee problems," with no cartilage between his knee and bones. Id. at 59. He

said that his doctor provided the cane because he can "barely walk." Id. Plaintiff then used the hearing room to indicate he could walk from his chair to the waiting room door before needing to take a break. Id. Plaintiff stated that the pain in his knees at the time of the hearing was at a level 8. Id. Plaintiff testified that he had pain in his back, which he feels all the time. Id.

Plaintiff noted that he spends most days doing a little bit of reading, followed by taking pain medication and medication for his conditions, and then tries to sleep. Id. at 60. Plaintiff stated he has trouble with his vision. Id. Plaintiff said he is blind in his right eye from birth, and his vision has worsened because he squints. Id. at 60-61. He said he cannot read things right in front of him and must ask others what it says or what he is looking at. Id. at 60.

During the hearing, the ALJ also questioned the Vocational Expert ("VE"), Connie Guillory, regarding Plaintiff's employment history. Id. at 49, 56. The ALJ asked if Ms. Guillory had any information from the file as to what claimant did in 2008 and 2009. Id. at 55. Ms. Guillory stated that she did not have information in her file about Plaintiff's cleaning job, church assembler position, or sandblaster position. Id. at 56. She categorized Plaintiff's job as a security guard as "light and semi-skilled with an SVP of 3." Id. at 57. She categorized his cleaning job as "medium and unskilled with an SVP of 2." Id. at 57. The ALJ presented Ms. Guillory with a hypothetical of:

> [Someone with the] claimant's age, education, prior work experience. Assume this person is restricted to a light range of work, no work on unprotected heights, no work on dangerous machinery, no ladders, occasional stairs and ramps, occasional stooping and bending, no job that requires depth perception and no excessive noisy environment like loud industrial environment. Simple and repetitive tasks, no sustained interaction with coworkers or supervisors. However, incidental, or brief social conversation is not precluded. No problem solving with either of those group. Could such a hypothetical individual perform claimant's past work?

Id. at 61.

Ms. Guillory said "No, Your Honor. They would not be able to." Id. When asked about whether there was other work that such a hypothetical individual could perform, Ms. Guillory stated that he could be an "inspector," a "hand packer," or a "sub assembler." Id.

Next, the ALJ asked the vocational expert about another hypothetical of an individual with the same restrictions as in the previous hypothetical, but someone who "would be off task at least 20 percent of the work day due to pain and/or inability to maintain concentration, persistence or pace." Id. at 62. Ms. Guillory responded that the positions of inspector, hand packer or sub assembler could not be performed by that hypothetical individual. Id. After considering a few other positions, she said that there would be no work for that hypothetical individual. Id.

Plaintiff's attorney stated that the record shows Plaintiff has a case worker with the regional center, who brought Plaintiff to the hearing Id. at 64. "[Plaintiff] is a person that . . . without that kind of support I don't think he could function day to day . . . [A]nd the] consultative exam (Exhibit 12-F)] done in October of 2016, has had him marked and extreme with a GAF of 35." Id. at 64-65.

### III.  SUMMARY OF THE ALJ'S DECISION

On March 13, 2019, the ALJ issued a written decision in which he determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from October 1, 2015 through the date of the ALJ's decision. AR 20-40. The ALJ proceeded to follow the Commissioner's five-step sequential evaluation process. See 20 C.F.R. §§ 404.1520, 416.920.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment after the alleged onset date October 1, 2015. AR 25.

At step two, the ALJ found that Plaintiff had the following severe impairments: "obesity, blindness in the right eye, congenital sensorineural hearing loss, cervical and lumbar strain/sprain, chondromalacia bilateral knees, history of carpal tunnel syndrome, status post-surgery, hypertension, headaches, depressive disorder, and borderline intellectual functioning." Id.

At step three, the ALJ found that Plaintiff does not have an impairment, or a combination of impairments, that met or medically equaled one of the impairments as defined in 20 CFR Part 404. Id. at 26. The ALJ first determined Plaintiff's residual

functional capacity (20 CFR §§ 404.1520(e) and 416.920(e)). Id. at 29. The ALJ found that the Plaintiff has the RFC to perform light work. Id.

> He is able to occasionally climb ramps and stairs, stoop, and bend. He is unable to perform jobs that require depth perception. He needs to avoid work at unprotected heights or around dangerous moving machinery. He needs to avoid excessive noisy environment. He is able to perform simple, routine tasks with no sustained, intense interaction with coworkers and supervisors. He is able to tolerate incidental and brief social conversation which is not precluded.

Id.

At step four, the ALJ found that Plaintiff, based on his limitation to less than the full range of light work, was unable to perform his past relevant work as a security guard or cleaner. Id. at 38. At step five, the ALJ adduced and accepted the VE's testimony that a hypothetical person with Plaintiff's vocational profile could make a successful adjustment to other work as an "inspector," a "hand packager," or a "sub-assembler." Id. at 39. Accordingly, the ALJ found that Plaintiff was not disabled. Id.

## IV. STANDARD OF REVIEW

The Social Security Act permits unsuccessful applicants to seek judicial review of the Commissioner's final decision. 42 U.S.C. § 405(g). The scope of judicial review is limited in that a denial of benefits will not be disturbed if it is supported by substantial evidence and contains no legal error. Id.; see also Trevizo v. Berryhill, 871 F.3d 664, 674 (9th Cir. 2017) (citing Benton ex rel. Benton v. Barnhart, 331 F.3d 1030, 1035 (9th Cir. 2003)).

Substantial evidence is "more than a mere scintilla but may be less than a preponderance." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006). It is evidence that a "reasonable mind might accept as adequate to support a conclusion." Id. In determining whether the ALJ's findings are supported by substantial evidence, the court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Trevizo, 871 F.3d at 674-75 (quoting Orn, 495 F.3d at 630).

Further, the court reviews "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Garrison v. Colvin, 759 F.3d 995, 1010 (9th Cir. 2014). Additionally, the court may not reverse the ALJ's decision on account of a harmless error. Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012). The burden of proving harmless error falls upon the party attacking the agency's determination. Id.

Section 405(g) permits a court to enter judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). The reviewing court may also remand the matter to the Social Security Administration for further proceedings. Id.

## V. DISCUSSION

Plaintiff challenges the ALJ's adverse decision on one ground. Plaintiff contends that the ALJ improperly rejected the opinion of psychiatric consultative examiner, Dr. Hailey. Pl.'s Mot. at 4-11. Plaintiff contends the ALJ erred by failing to articulate specific and legitimate reasons for rejecting Dr. Hailey's opinion. Id. at 4.

The Court addresses this ground below.

### A. Summary of Parties' Arguments About Whether the ALJ Properly Rejected the Opinion of Psychiatric Consultative Examiner Dr. Hailey

Plaintiff claims the ALJ erred in rejecting the opinion of psychiatric consultative examiner Dr. Jennifer Hailey by giving greater weight to the non-examining doctors in this case. Id. at 10. Plaintiff states "the [non-examining doctors] only reviewed the evidence available to them at the time of their review," while Dr. Hailey reviewed the records and had the opportunity to examine Plaintiff in person. Id. Plaintiff argues that Dr. Hailey had a more comprehensive picture of Plaintiff's condition than any other doctor who provided an opinion on this record. Id. at 10. Plaintiff contends that the ALJ's general statement that the "evidence shows relatively stable objective findings" fails to adequately explain why Dr. Hailey's opinion is purportedly unsupported. Id. at 7.

Plaintiff further argues that the ALJ failed to "mention that Taylor's responsibilities at the Independent Living Facility (ILF) are monitored through an Individual Program Plan

(IPP) established by the San Diego Regional Center." Id. at 5 (citing AR 718, 724). Plaintiff states that Taylor qualified for Regional Center services due to his diagnosis of mild intellectual disability. Pl.'s Mot. at 6 (citing AR 724). Plaintiff argues that the ALJ seemingly "downplays the significance of the Regional Center services [Plaintiff] receives . . . [Plaintiff] was working in an independent living facility through a program created to help developmentally disabled individuals integrate into the workforce." Pl.'s Mot. at 7. In support thereof, Plaintiff argues:

> [Plaintiff's] ILF worker was assisting in reporting his income to SSI. He has difficulty budgeting money and will spend too much on food without the support of his ILF worker. He was going to work with his ILF worker to help him find a local parenting class. An IPP from September 2015 indicated that he is managing his money and paying his bills on time, but he is doing so with help from Regional Center with making a list of items he needs, budgeting, and connecting Taylor with resources in the community, including food banks and other services to help him take care of his daughter. An IPP report from November 2017 indicates that Taylor continues to utilize assistance from ILF staff for scheduling and attending medical appointments. The plan at the time is to continue to utilize ILF staff to assist and provide verbal prompting for scheduling appointments. He continued to have difficulty budgeting and will run out of money by the end of each month.

Id. (internal citations and quotations omitted).

Plaintiff argues he objectively exhibited low functioning on intellectual functioning, and that "more recent records demonstrate issues with social interaction in the form of interpersonal conflicts . . . he exhibited poor hygiene and demonstrated abnormal affect through the more recent treatment records." Id. at 8. Plaintiff cites to Dr. Zaven Bilezikjan's orthopedic consultative examination on December 18, 2015, in which he noted that "[Plaintiff] presented with unusual facial problems, probably developmental in nature. He respond[ed] to questions, but had difficulty giving full details." AR 384. Plaintiff also cites to Dr. Whitehead's psychological consultative examination on February 10, 2016 as set forth below:

> Taylor's ILF manager took him to the County of San Diego Mental Health Services in June 2016. Taylor presented as malodorous and kept falling asleep during the assessment . . . Dan Whitehead, Ph.D., conducted a consultative

examination. Similar to Dr. Hailey's observation, [Plaintiff] was unable to perform Serial 7's or Serial 3's, although he was able to count backwards from 20 correctly. On the Wechsler Adult Intelligence Scale-4 (WAIS-4), [Plaintiff's] composite score summary fell within the borderline range. His highest scaled score was the Perceptual Reasoning Index Scale, which was in the lower 6 percentile, and his lowest scaled score was his Full-Scale IQ of 73, falling in the bottom 3 percentile.

Id. (citing AR 389-94).

Defendant argues that the ALJ properly analyzed the evidence to afford Dr. Hailey's opinion little weight. Def.'s Mot. at 8. Defendant states that the ALJ "noted multiple instances of substantially unremarkable mental status examinations showing largely full orientation, normal speech, memory and thought content, appropriate affect, insight and judgment, coherent thought process, and good hygiene, both before and after Dr. Hailey's opinion." Id. (internal citations omitted). Defendant states that "the ALJ gave specific and legitimate reasons for affording Dr. Hailey's opinion little weight, namely because her opined statements: (a) were inconsistent with the longitudinal record, including documentation showing Plaintiff's continued improvement in activities of daily living and other doctors' examinations; and (b) were contradicted by another consultative examiner and three other doctors' opinions, rendered after reviewing Dr. Hailey's examination and opinion." Id. at 11 (citing AR 36-37).

Defendant further argues that the record shows "Plaintiff made significant progress throughout the relevant period, including by managing his money, paying bills on time, comparing grocery prices when shopping, and looking for employment." Def.'s Mot. at 7. Defendant states that "Plaintiff was independent in all areas of self and home care, there were no concerns with his ability to get along with others, and he expressed repeated interest in finding employment." Id. Defendant states that "as the ALJ discussed, with some assistance, Plaintiff was able to schedule medical and dental appointments and hold the position of house manager for a group home, which entailed preparing fellow residents' meals, ensuring they took their medication, providing security, and keeping the residence clean." Id. (internal citations omitted). Defendant also argues that "[i]n mid-2015, with

assistance, Plaintiff was noted as 'manag[ing] his money very well' and that 'he continues to pay all of his bills on time.'" Id. Defendant states that Plaintiff was "'doing well in regard to parenting skills' including taking and picking up his daughter every day, helping her with school assignments, cooking for her, buying what she needs, and spending time with her, such as taking her to the park." Id.

### B. Relevant Law Regarding Opinions of Treating and Examining Physicians

In evaluating medical opinions, the regulations distinguish among three categories of physicians: (1) treating physicians; (2) examining physicians, who examine, but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. 20 C.F.R. § 404.1527(c); (e)[2]; see also Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." Holohan v. Massanari, 246 F.3d 1195,1202 (9th Cir. 2001); see also 20 C.F.R. § 404.1527(d)(2). "The opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Lester, 81 F.3d at 830-31 (citing Andrews v. Shalala, 53 F.3d at 1035, 1043 (9th Cir. 1995)).

### C. Analysis

#### i. The ALJ's Treatment of Dr. Hailey's Opinion

In his written decision, the ALJ found:

> Psychiatric consultative examiner, Dr. Jennifer Hailey, examined the claimant in October 2016 . . . . Dr. Hailey diagnosed the claimant with unspecified depressive disorder and r/o BIF. Dr. Hailey found that the claimant has marked limitations in his ability to follow simple oral and written instructions and

---

[2] The Social Security Administration issued new regulations effective March 27, 2017. Unless otherwise stated, all regulations cited in this decision are effective for cases filed prior to March 27, 2017.

> extremely limited ability to follow detailed instructions. He has markedly limited ability to interact with the public, coworkers and supervisor, and markedly limited ability to comply with job rules, such as safety and attendance. He has extremely limited ability to respond to changes in a routine work setting and respond to work pressure in a usual work setting.
>
> The residual functional capacity found by Dr. Hailey is inconsistent with the record . . . . The record does not support a finding that the claimant's mental impairments are so severe as to be disabling. Specifically, progress report from San Diego New Horizons Independent Living Services reveal that the claimant has been able to maintain mostly independent living, aside from assistance with scheduling and managing his medical appointments and budgeting. He has also been working as a house manager for the ILF in exchange for reduced rent and some meals, and his duties include ensuring that the residents take their medication, cooking the meals, providing security, and keeping the residence clean. Additionally, the claimant's mental health treatment notes reveal relatively stable objective findings. Accordingly, little weight is given to Dr. Hailey's opinion.
>
> The undersigned notes that Dr. Hailey assessed a Global Assessment of Functioning (GAF) score of 35, indicating major impairment in several areas, such as work or school, family relations, judgement, thinking, or mood. However, the undersigned finds GAF scores in general are of limited evidentiary value. These subjectively assessed scores reveal only snapshots of impaired and improved behavior. The undersigned gives more weight to the objective details and chronology of the record, which more accurately describe the claimants' impairments and limitations. For these reasons, the undersigned gives little weight to the GAF score documented in the record.

AR at 36-37 (internal citations omitted).

First, the ALJ gave greater weight to the opinions of non-examining physicians than to an examining physician, Dr. Hailey. The ALJ notes that he gave "great weight" to the opinions of the non-examining State agency psychological consultants, Joshua D. Schwartz, Ph.D., Tawnya Brode, Psy.D., and Janet Telford Tyler, Ph.D., who reviewed the file and provided opinions about Taylor's condition. Id. at 37 (internal citations

omitted). The ALJ found generally that their opinions "are consistent with the record." Id. Thus, although Ninth Circuit law requires that Dr. Hailey's opinion be given greater weight than that of non-examining physicians, the ALJ did the opposite. See Lester, 81 F.3d at 830.

Next, if there is a conflict between medical opinions, the ALJ must give specific and legitimate reasons for discounting or rejecting an examining physician's testimony. The ALJ rejected Dr. Hailey's opinion because it was purportedly inconsistent with Plaintiff's daily activities as set forth in (1) progress reports from San Diego New Horizons Independent Living Services and (2) Plaintiff's mental health treatment notes revealing relatively stable objective findings. AR 36.

The ALJ noted the opinions of the non-examining State agency psychological consultants regarding the claimant's abilities to do work-related activities/functional limitations. The ALJ stated that Joshua D. Schwartz, Ph.D., and Tawnya Brode, Psy.D., found:

> [Plaintiff] is able to understand and remember simple instructions and carry out simple instructions. He is able to maintain concentration and attention over extended periods for simple tasks. He is able to maintain concentration and attention over extended periods for simple tasks. He is able to sustain superficial interaction with the public and maintain relationships with coworkers and supervisors. He is capable of appropriately responding to most changes in the work setting.

AR 37.

However, the ALJ failed to address or otherwise consider that Plaintiff's responsibilities at the Independent Living Facility are monitored through an Individual Program Plan (IPP) established by the San Diego Regional Center. Under California's Lanterman Act, "developmentally disabled persons receive services through providers under contract with a 'regional center." Zepeda v. Colvin, 2015 WL 9239714, at *6 (9th Cir. 2014) (internal citation and quotation omitted). A regional center is "a diagnostic, counseling, and service coordination center for developmentally disabled persons and their families." 17 Cal. Code Regs. § 54302(a)(54). There is no indication that a regional center simply offers an eligible person any service within its scope. Instead, the regional center is

required to prepare an individual program plan (IPP) "developed through a process of individualized needs determination." Cal. Welf & Inst. Code § 4646(b)-(c). The IPP includes an assessment of the claimant's capabilities and limitations, and a schedule of the type and amount of services necessary to achieve certain objectives. See Sanchez v. Johnson, 416 F.3d 1051, 1064 (9th Cir. 2005); Cal. Welf. & Inst. Code § 4646.5. When developing an IPP for a working age adult, the interdisciplinary team "shall consider the Employment First Policy in § 4868 et seq. Id. §§ 4646.5(a)(4), § 4868(a)(2). The purpose of the Employment First Policy is to identify strategies, best practices, and incentives for increasing integrated employment and gainful employment opportunities for people with developmental disabilities. Id. § 4648(c)(3).

Here, the ALJ concluded that progress reports from the Plaintiff's Independent Living Facility "reveal that [Plaintiff] has been able to maintain mostly independent living, aside from some assistance with scheduling and managing his medical appointments and budgeting." AR 36. Plaintiff works in an independent living facility through a program created to help developmentally disabled individuals integrate into the workforce. Plaintiff continued to need help remembering appointments and with budgeting while in a structured environment set up specifically to help him succeed. It is not clear whether the ALJ properly considered the transferability of Plaintiff's daily activities to a workplace environment. Thus, the Court finds that the ALJ did not provide specific and legitimate reasons, based on the record, for discounting Dr. Hailey's opinion.

The ALJ also focused on Plaintiff's daily activities in support of his conclusion that "the claimant has a greater sustained capacity than he alleges." Id. at 37. The Court finds that the ALJ failed to explain how any of these daily activities (personal care, grooming, cooking, cleaning, playing computer games, working as a house manager, taking public transportation, etc.) were inconsistent with Dr. Hailey's opinion. While the ALJ's opinion identified a wide range of Plaintiff's daily activities that could indicate that Plaintiff was not as limited as Dr. Hailey assessed, the ALJ failed to identify which of the activities the ALJ believed were inconsistent with Dr. Hailey's opinion. Instead, the ALJ merely

concluded that the described daily activities are "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." Id.

The Ninth Circuit has repeatedly warned about the dangers of considering a claimant's daily activities without the necessary context to determine if they truly rebut the claimed severity of an impairment. See, e.g., Trevizo, 871 F.3d at 676, 682 ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." (quotation marks omitted)); see also Guzman v. Berryhill, 356 F. Supp. 3d 1025, 1039 (S.D. Cal. Dec. 20, 2018) (finding ALJ erred by not explaining how daily activities would have no more than a minimal impact on [claimant's] ability to work); Godow v. Comm'r of SSA, No. CV 17-08160-PCT-MHB, 2018 U.S. Dist. LEXIS 171052, at *14 (D. Ariz. Sep. 28, 2018) ("The ALJ must point to specific inconsistencies between Plaintiff's daily activities and [the physician's opinions, and even if such inconsistencies exist, the ALJ must show Plaintiff's daily activities can transfer to the workplace."). As stated previously, Plaintiff is able to maintain his daily life through an assisted living facility, with personalized supervision and assistance, and activities specifically modified to suit Plaintiff's needs and abilities. This kind of individualized attention and care is not typically available in the workplace. Here, the ALJ failed to explain how Plaintiff's daily activities contradict his alleged limitations.

Similarly, the ALJ found that the Plaintiff's mental health treatment notes reveal relatively stable objective findings, without further indication of what those findings are. AR at 36 (citing exhibits 5F and 33F). The ALJ referred to Exhibit 5F earlier in the opinion and stated that "[t]he claimant underwent psychiatric assessment at Comprehensive Health Center in June 2016." Id. at 35. The ALJ conclusively summarized that the "assessment notes reveal that he presented with poor hygiene, but was friendly and polite." Id. The ALJ further noted that "[Plaintiff] also reported multiple stressors due to irresponsible roommate." Id. (citing 5F/24-34). However, the ALJ failed to address that at Plaintiff's

June 23, 2016 assessment at the Comprehensive Health Center, it was also noted in Exhibit 5F that:

> [Plaintiff] reports feeling tired, was seen sleeping in the waiting area. CLT c/o knee pain, walks slowly. CLT reports eating to relieve stress, reports 'I feel like the world is overwhelming me. I should have come here sooner. I need help.' He was brought in by his case worker today. He is malodorous. CLT keeps falling asleep during the assessment.

AR at 418. Similarly, in Exhibit 33F in Plaintiff's assessment completed on June 28, 2018, the ALJ failed to address that it states:

> [Plaintiff is] continuing to seek treatment for sadness, emotional reactivity, lack of motivation, frustration, poor self-esteem, anger outbursts consisting of shouting and breaking objects with and without triggers. . . . His fear and worry sometimes trigger insomnia, dizziness and agitation. Client reports that treatment has reduced voices he hears in his head. . . Client's depression, anger outbursts and anxiety impair his ability to sleep, relate to other, maintain possessions, remain safe, work and participate in positive activities, creating medical necessity for service.

AR at 839. These findings are absent from the ALJ's discussion of Plaintiff's medical records, and contradict the ALJ's conclusion that Plaintiff's mental health treatment notes reveal relatively stable objective findings. An ALJ may not consider evidence that supports the non-disability determination, while disregarding evidence that supports the contradictory opinion from a physician. See, e.g., Holohan, 246 F.3d at 1207; see also Reddick, 157 F.3d at 722-23 (finding that an ALJ may not "cherry-pick" from a record to support the conclusion, but rather must account for the context of the whole record). The ALJ's general conclusion that "[t]reatment notes from other care providers between December 2016 and March 2018 reveal that the claimant was oriented, with normal memory, mood and affect" [AR at 35] does not adequately identify what examination results or reports the ALJ is relying on in support of his conclusion. The Court finds that the ALJ failed to articulate specific and legitimate reasons supported by substantial evidence to discount the findings of Dr. Hailey's opinion.

In sum, the Court finds that the ALJ committed legal error by assigning little weight to the examining physician's opinion without appropriately considering the other relevant factors. The Court is unable to deem this error harmless and finds that it constitutes grounds for remand. The Court recommends that Dr. Hailey's testimony, upon remand, be

reexamined consistent with this opinion and the required specific and legitimate standard. Accordingly, the Court **RECOMMENDS GRANTING** Plaintiff's Motion for Summary Judgment and **DENYING** Defendant's Cross-Motion for Summary Judgment.

## VI. Remand Versus Award for Benefits

The law is well established that the decision whether to remand for further proceedings or simply aware benefits is within the discretion of the Court. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989); see also Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981). Remand is warranted where additional proceedings could remedy defects in the decision. See, e.g., Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984; Lewin, 654 F.2d at 635.  Remand for the payment of benefits is appropriate where no useful purpose would be served by further administrative proceedings, Kornock v. Harris, 648 F.2d 525, 527 (9th Cir. 1980); where the record has been fully developed, Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); or where remand would unnecessarily delay the receipt of benefits for which the disabled plaintiff is entitled, Bilby v. Schweiker, 762 F.2d 716, 710 (9th Cir. 1985).

Here, the Court has concluded that further administrative proceedings would serve a meaningful purpose to address the errors identified herein. Therefore, this Court **RECOMMENDS REVERSING** the ALJ's decision and **REMANDING** for further proceedings to address the errors noted in this Order.

## VII. CONCLUSION

For the reasons set forth above, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **GRANTED**, that Defendant's Cross-Motion for Summary Judgment be **DENIED**, and that judgment be entered **REVERSING** the decision of the Commissioner and **REMANDING** this matter for further administrative proceedings.

**IT IS HEREBY ORDERED** that any written objections to this Report and Recommendation must be filed with the Court and served on all parties on or before **September 28, 2021**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties on or before **October 19, 2021**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated:  September 7, 2021

_____
Honorable Linda Lopez
United States Magistrate Judge